ORIGINAL

NIGHT BOX FILED
JAN 09 2002
CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6311 CR-HUCK

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHN GALLO,

    Defendant.

_____

SENTENCING MEMORANDUM OF
DEFENDANT JOHN GALLO

NOW COMES the Defendant, John Gallo, by and through his counsel-of-record, James D. Henderson and Martin R. Raskin, and files this memorandum relating to his sentencing in this matter currently scheduled for January 18, 2002, at 3:00 p.m. before the Honorable Paul C. Huck, United States District Judge.

**INTRODUCTION/BACKGROUND**

The Defendant John Gallo was indicted on October 31, 2000, and arrested on November 6, 2000, for the laundering of funds obtained from an individual named Willie Jackson who resided in Miami, Florida. More specifically, Defendant Gallo was charged with having laundered in Southern California some $1.4 million received from Mr. Jackson. According to the indictment, the charged money laundering transactions took place between February 27, 1996,



and January 26, 1998. The laundering was effectuated by Jackson providing the defendant with funds which were then funneled through a company formed in Southern California under the name of Bitus Group Incorporated. Defendant Gallo received a fee for this service which was done essentially by providing cash to other companies which would then write checks to Bitus in exchange for "services" supposedly rendered by Bitus. The checks from the other companies were then deposited into the Bitus bank account and a check, minus Defendant Gallo's fee, was thereafter written back to Willie Jackson in order that the money would appear to come from a legitimate source.

On April 23, 2001, Defendant Gallo entered a plea of guilty to count 5 of the Indictment (the money laundering conspiracy count) based on his involvement in the scheme described above, and pursuant to a written plea agreement on file with the court. The defendant has been cooperating with the United States Attorney's Office in its ongoing investigation and continues to do so. He has also agreed to cooperate with European law enforcement authorities at the request of the Miami U.S. Attorney's Office. John Gallo has been incarcerated for some 11 months in this case and was released on bail on October 12, 2001, pending his sentencing. He has complied with all conditions of his bond. As noted above, the defendant's sentencing is presently scheduled for January 18, 2002, at the hour of 3:00 p.m.

## THE DEFENDANT'S PLEA AGREEMENT

The defendant's plea agreement, among other provisions, sets forth that the Government will recommend a three level reduction in John Gallo's offense level pursuant to Guidelines § 3E1.1, and that he be sentenced at the low end of the Guidelines range which is ultimately determined. The presentence report, it is noted, has found the defendant's offense level to be

a 22. It has been stipulated in the plea agreement that the relevant amount of money laundered by the defendant was more than $1 million and less than $2 million. Further, pursuant to his plea agreement, the defendant has forfeited all assets of the companies known as Triple J. Enterprises, Inc., Bitus Group Inc., and Klimaxxx Productions Inc. In addition, it is again noted that Defendant Gallo has been, and is, cooperating with the Government in various ongoing investigations. A motion pursuant to Sentencing Guidelines § 5K1.1 is anticipated. Pursuant to his agreement to cooperate, and at the request of the prosecution, in addition to the information provided to the U.S. Government, Mr. Gallo is scheduled to be debriefed by Belgian law enforcement authorities within the next few days.

Finally, paragraph 8a of the plea agreement sets forth that the parties to the agreement disagree as to whether the defendant should be sentenced pursuant to Guidelines § 2S1.1(a)(1) or § 2S1.1(a)(2). The defendant's position on this issue, as well as that of the U.S. Probation Office, is set out below.

## THE PRESENTENCE REPORT

Both the defendant and undersigned counsel have reviewed the presentence report prepared by United States Probation Officer Connie Garcia. The report is complete, accurate, and the defendant maintains no substantive objections thereto. In view of the above-noted disagreement in the plea agreement relating to the correct application of Sentencing Guidelines § 2S1.1, however, the defendant does note the following. It is undisputed that the Guidelines offense level calculation for the defendant's crime is essentially determined by § 2S1.1 relating to "Laundering Monetary Instruments." The base offense level for this section, prior to any increase based on value, is either a 20 or a 23. The higher level, as set forth in the Commentary

accompanying the section, is reserved for those defendants whose laundering "encouraged or facilitated the commission of further crimes." As pointed out in numbered paragraph 34 and accompanying footnote 2 of the defendant's presentence report, the only evidence linking the Defendant Gallo to the knowledge that the laundered money was from narcotics proceeds, or that the laundered proceeds were used in the commission of future crimes, is the uncorroborated word of Willie Jackson, which word concerning the scope of Mr. Jackson's narcotics activity has been rejected by a jury of twelve. The Defendant Gallo, who has candidly admitted his involvement in laundering but a small portion of the some $68,000,000 which Jackson claims to have earned, vehemently denies, and has consistently denied, any suggestion that he (Gallo) knew either the source of the funds to be laundered or that said funds were to be used to commit further criminal activity. In this regard, the defendant's laundering activities were only undertaken in order to earn a fee for himself by helping Willie Jackson hide and conceal funds which the Defendant Gallo did believe to have been illegally generated. At no time did the Defendant Gallo attempt to promote, facilitate or assist in the commission of future crimes and Willie Jackson went so far as to tell the defendant that he was using the money to build a house, to pay taxes, and for investment purposes. Such, of course, is clearly the type of activity contemplated by § 2S1.1(a)(2) rather than § 2S1.1(a)(1). There is simply no tangible evidence of any type to indicate that any money laundered by John Gallo went back into Willie Jackson's narcotics operation. Further, undersigned counsel have spoken to defense counsel who were present for Willie Jackson's testimony at the trial of those who were acquitted, and have reviewed the materials provided by the Government via the discovery process and the prosecution's trial memorandum. There was no indication whatsoever during the trial, or in the discovery materials or trial memorandum, that

4

John Gallo was involved in the narcotics activity in any way. Of the some $68,000,000 in proceeds which Willie Jackson claims was earned by the group which went to trial, all indications are that the Defendant Gallo simply laundered a small portion of the personal profits earned by Willie Jackson. This, of course, is totally consistent with attempting to help conceal a portion of the funds earned by Jackson through a participant uninvolved in the actual narcotics operation at a location far from Florida, rather than with Defendant Gallo facilitating the commission of additional narcotics activity. Finally, consistent with the Gallo guilty plea and his written statement to the U.S. Probation Office (included in the presentence report at pages 12-13), the transcript of the Willie Jackson trial testimony indicates that he sent ultimate proceeds from sales, rather than drug business operating capital, to Defendant Gallo in order to make the proceeds look legitimate and to make it appear that they were derived from an appropriate source. On several occasions, the transcript reveals that Mr. Jackson was asked at trial how the drug money was divided between those who received portions as a result of their efforts in the Florida drug activities. Mr. Gallo's name was never mentioned in this context. To the contrary, the transcript reveals that Mr. Jackson explained that, in substance, after he obtained his share, he laundered a portion of the share by sending it to Mr. Gallo, who would return it to him via company checks in exchange for a fee. Once more, this after-the-fact activity is of the type which fits squarely within the contemplation of § 2S1.1(a)(2). Accordingly, because the Government's view that § 2S1.1(a)(1), rather than § 2S1.1(a)(2), should be utilized to compute the defendant's offense level cannot be sustained by a preponderance of the evidence, the conclusions of the Probation Officer set forth at page 14 of the presentence report, appear to be correct ones. As a result, as

set forth at numbered paragraph 63 of the presentence report, factoring in the § 3E1.1 adjustment for acceptance of responsibility produces a final offense level calculation of 22.

## THE BUREAU OF PRISONS DRUG PROGRAM

Numbered paragraphs 85 and 86 of the presentence report note that the defendant has been a heavy cocaine user for some 20 years. As shown by the attached copies of statements from two close business associates, including a former police officer, and John Gallo's spouse (see group Exhibit "A"), the defendant's use became especially heavy some five years ago while he was involved in the violation to which he has entered his plea. Today, according to the defendant's wife Janet Gallo, at least one of the defendant's children appears to have a potentially serious marijuana problem. The Bureau of Prisons presently operates a full-time extensive and often beneficial residential drug program for individuals such as this defendant. According to the Bureau of Prisons manual, the program is directed towards, among others, those whose drug use may have contributed to the offense of conviction. In the instant case, it is impossible to conclude that the defendant's cocaine use was not, at the least, a factor in his involvement in a scheme to obtain extra funds to supply his habit. Undersigned counsel have discussed the drug program with both U.S. Probation Officer Connie Garcia, who drafted the presentence report, and with Assistant United States Attorney Michael J. Dittoe, who is handling this matter on behalf of the Government. Neither Ms. Garcia nor Mr. Dittoe maintain any objection to the court's recommending the placement of the defendant into the Bureau of Prisons Drug Program. In fact, Ms. Garcia encourages it strongly. This defendant is one for whom such placement would be highly productive. The B.O.P. internal guidelines call for mandatory placement of an individual such as this defendant into the full-time drug program if such is recommended by the court.

## THE DEFENDANT'S CRIMINAL HISTORY CATEGORY IS OVERSTATED

Pursuant to Sentencing Guidelines § 4A1.1, the Defendant John Gallo falls within Criminal History Category III. This is noted in numbered paragraphs 64-67 of the presentence report which concludes that the defendant has four (4) criminal history points.

Pursuant to Guidelines § 4A1.1(a), three of the defendant's four points are a result of his 1987 conviction for evading income taxes during 1980 and 1981 in which case his sentence exceeded one year and one month. The defendant was sentenced to 3 years imprisonment and served approximately 18 months. Thereafter, he successfully completed post-release supervision without incident.

The defendant's fourth criminal history point, pursuant to § 4A1.1(c), results from his 1993 no contest plea to failing to provide child support for John Gallo, Jr., a son who resided with Emma Loya in Los Angeles. His $600 in non-payments was a result of inability as is evidenced by his personal bankruptcy referenced in numbered paragraph 117 of the presentence report. It is noted that Ms. Loya caused this action to be filed despite the defendant having previously paid many thousands of dollars in child support while he was able to do so. He was sentenced to probation and ultimately brought his payments current by borrowing funds from friends despite having no income to pay his own rent.

It is the position of undersigned counsel that, in accordance with Sentencing Guidelines § 4A1.3(e), the Defendant Gallo's Criminal History Category of III over-represents the seriousness of Defendant Gallo's criminal history and the likelihood that he will commit future crimes. As a result, counsel believe the Defendant Gallo should be sentenced in a lower criminal

history category. The child support conviction, for example, was but a misdemeanor occasioned by the basic fact that John Gallo was unable to make payments and fell merely $600 in arrears. When the defendant was able, payments were subsequently brought current. In fact, prior to the incident, the defendant had paid some $39,000 in child support over a 15-year period and subsequently paid an additional $4,300 for a total, according to the court's accounting records, of $43,300. Such is hardly true criminal behavior and would seem to be inappropriate as a vehicle to increase a defendant's criminal history level. In the case of Defendant Gallo, this incident increases his criminal history level from a Category II to a Category III correspondingly increasing his jail time by some 5-6 months. Pursuant to California Penal Code § 1203.4, this violation, in fact, could be expunged at any time by the simple filing of a form petition. Had it been timely expunged, it could not even be considered in the defendant's Criminal History Category computation. Expungement under the referenced statute, under California law, is considered mandatory as there were no probation violations by the defendant. In addition to the fact that this conviction and its circumstance do not themselves merit a present day increase in the defendant's jail time, he should also not suffer extra imprisonment because of some former counsel's procedural oversight.

As to the income tax conviction, such took place more than 15 years ago and related to activity 20 and 21 years ago. It was neither a crime of violence nor narcotics related.

In view of the more than 15 intervening years between the defendant's felony convictions, and the more civil than criminal nature of his promptly remedied misdemeanor violation, a Criminal History Level of Category III for this defendant appears to significantly over-represent the seriousness of his criminal background. As a result, it is respectfully submitted that the

Defendant Gallo should be sentenced in Criminal History Category I, and certainly no higher than in Category II.

## THE APPROPRIATE SENTENCE

The defendant is 58 years of age and has an intact marriage of almost 19 years. The business in which he was involved prior to his arrest, and in which he is still involved, is a legitimate and potentially productive one. The defendant has two teenage sons, Paul and Mark, via his present marriage, both of whom need male supervision and control. As noted in numbered paragraphs 78-80 of the presentence report, Mark has attention deficit disorder, is experimenting with drugs, and is having difficulty in school. The older son Paul has been expelled from school and is attending a "continuation school" for children with behavioral problems. Both children, it is noted, have seen their personal difficulties worsen since their father's absence and their mother is unable to adequately control them. It seems clear that the more prolonged their father's absence from them, the more at risk they become.[1]

The defendant himself was not here involved in either narcotics importation or distribution. He was, however, a money launderer and he should be punished accordingly. He has cooperated with the Government and will continue to do so. The attached letter from Daniel Bender of Digital Concepts International (Exhibit "C") indicates that a legitimate economic future may await this defendant in the absence of extended incarceration. His cooperation with the Government effectively cut his ties with those of questionable character from his past. His family has stood by him and he will remain under Government supervision for a number of years.

---

[1] See attached Exhibit "B."

9

As the court may recall, the plea agreement in this case calls for a Government recommendation at the low end of the Guidelines scale. It is respectfully requested that the defendant, who has already served almost a year in custody, be sentenced in accordance with that recommendation in order that he return to his family in California as soon as possible.

### RESTITUTION/FINE

As noted in numbered paragraph 51 of the presentence report, the defendant's crime is a Title 18 violation with no identifiable victims. As a result, pursuant to Guidelines § 5E1.1, no restitution is appropriate in this case. Numbered paragraph 130 of the presentence report notes that the minimum fine for the defendant's offense is $7,500. Although the plea agreement calls for a low end recommendation at the defendant's final offense level, it is requested that the court waive any fine pursuant to Guidelines § 5E1.2(e). This section allows for waiver where the defendant does not maintain the ability to pay or where payment would unduly burden the defendant's dependents. In the instant case, the defendant's wife and sons are without income as long as he is incarcerated. The presentence report, at numbered paragraph 107, shows a negative monthly cash flow of $5,625. The family's liquid assets of some $22,000, which are listed in numbered paragraph 107, have already been depleted. Previously referenced attached Exhibit "C" indicates that any potential for Digital Concepts, in terms of realizable economic returns, is only down the road and that the defendant's present interest in the company has no liquid value. As a result, the defendant's only assets are potential and speculative ones. Further, it may be remembered that the defendant has agreed to a number of forfeitures. The forfeiture of the assets of the company known as Klimaxxx, for example, put a viable legal company out of business which was built by five years of effort and an infusion of the defendant's personal funds. Because

it was partially funded by a $200,000 loan from Willie Jackson, however, it was forfeited. This included approximately $1,000,000 in master copies of the company's films. This forfeiture of the substantial assets has effectively dried up the defendant's only real source of income. With no present income and with two problem sons and a wife to support, the court is well within its discretion in waiving for this defendant, any fine pursuant to Sentencing Guidelines § 5E1.2.

## CONCLUSION

Based on all of the above and pursuant to the plea agreement on file with the court, it is respectfully requested that Defendant John Gallo be sentenced at the low end of the final Guidelines sentencing calculation. It is also requested that the court recommend the defendant's placement in a full-time B.O.P. residential drug treatment program, and that any period of imprisonment be served in the B.O.P. camp facility at Nellis Air Force Base (Nevada). The defendant is camp eligible, and the Nellis facility is the nearest to his family, and it operates a full-time B.O.P. drug program.

Respectfully submitted,

Dated: January 9, 2002

LAW OFFICES OF JAMES D. HENDERSON
Attorneys for Defendant John Gallo
12121 Wilshire Boulevard, Suite 1120
Los Angeles, California 90025-1123
(310) 478-3131 (phone)
(310) 312-0078 (fax)

By: *James D Henderson*
James D. Henderson
California Bar Number 104150

Dated: January 9, 2002

RASKIN & RASKIN, P.A.
Attorneys for Defendant John Gallo
2937 Southwest 27th Avenue
Miami, Florida 33133
(305) 444-3400 (phone)
(305) 443-0266 (fax)

By: /s/ Martin R. Raskin (JDH)
Martin R. Raskin
Florida Bar Number 0315206

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been delivered by U.S. mail this 9th day of January, 2002, to:

Michael Dittoe
Assistant U.S. Attorney
500 East Broward Boulevard, 7th Floor
Fort Lauderdale, Florida 33394

Ms. Connie Garcia
U.S. Probation Officer
300 N.E. 1st Avenue, Room 315
Miami, Florida 33132-2126

/s/ James D. Henderson
JAMES D. HENDERSON

**Jay Shanahan**
9623 Canoga Ave.
Chatsworth, CA 91311
818-407-5401-818-407-5404 fax

Ms. Connie Garcia                                              5-25-2001
United States Probation Officer
300 N. E. First Avenue
Miami, FL 33132

Dear Ms. Garcia,
I am an Ex Chicago police officer and am writing this letter on behalf of Mr. John Gallo. I have known John since 1993 as a personal friend. During this time I have known that John had an on and off drug problem with cocaine usage. On several occasions I asked John about his usage problem but every time he indicated to me that he had it under control and could handle it himself. On one occasion approximately one and one half year ago, his problem became especially evident and he actually disappeared for periods of time on and off for about six months and could not be found by any of his family members or friends. When he resurfaced he admitted to us all that his cocaine problem became so bad that he was living in a local hotel and would not leave, would order take out and have the drugs delivered to him where he was staying.
If I can help your decision with any further information whether to place John in a drug rehabilitation program please do not hesitate to contact me.
I certify and declare under penalty of perjury, that the foregoing is true and correct. Executed on day 25 of May 2001, at 12:05PM.

Sincerely,

Jay Shanahan

ATTACHMENT / EXHIBIT A

EXHIBIT "A"

PAGE 1

# Danny Wallace
9623 Canoga Ave.
Chatsworth, CA 91311
818-407-5401-818-407-5404 fax

Ms. Connie Garcia                                    5-26-2001
United States Probation Officer
300 N. E. First Avenue
Miami, FL 33132

Dear Ms. Garcia,

I am a Co-Worker of Jay Shanahan and am writing this letter on behalf of Mr. John Gallo as a friend. I have known John since 1997. During this time through my association with Jay and John, I have known that John had an on and off problem with cocaine usage. I was aware that Jay had asked John about this problem and that Jay was assured that the problem was under control. About a year and a half ago, John disappeared for several months do to his problem with cocaine. On many occasions during this period, I personally took phone calls from other friends and his family inquiring if we had heard from John. They were concerned, as were Jay and I. When he returned, he admitted to us that his cocaine problem became so bad that he had been living in a hotel, ordering take out and having drugs delivered to him.

If I can help your decision with any further information whether to place John in a drug rehabilitation program please do not hesitate to contact me.

Sincerely,

Danny Wallace

EXHIBIT "A"
PAGE 2

May 24, 2001

Ms. Connie Garcia
United States Probation
300 N.E. 1st Avenue
Room 315
Miami, Florida 33132

Dear Ms. Garcia:

I have been married to John P. Gallo for almost 17 years. We have two boys in their teens from that marriage.

Over the past 5 to 6 years, I became aware that John was using drugs. He has been essentially a user of cocaine, he has also used marijuana. In the last couple of years, his drug habit became increased as he was using more and more before he was arrested.

It was only when John was arrested, and we talked about what was going on in his life that I began to understand how serious this longtime problem was. It seemed apparent to both of us that he was punishing himself; maybe more than what he will be sentenced for as a result of his present crime.

The damage that this problem has caused was more to himself than to anyone else, but it has hurt our family as well. He has always been a very good father and the boys miss him a lot. Close to his arrest, the boys became aware of his drug problem and it caused great pain to all of us. And, one of our sons has started experimenting with marijuana. The boys need their father to be home and well, as they have suffered because of this.

John has never received counseling. I truly believe that him getting into a drug program will greatly benefit him, as he has expressed to me the need for help. I have no doubt that with all this behind us, he will get back to a normal life, drug free.

I beg you, to persuade the Court to allow John to get the help in the program and return him, the man I married, the man I respect and father that our children desperately need.

Sincerely,

*[signature: Janet L. Gallo]*

Janet L. Gallo

**EXHIBIT** \_\_A\_\_

**PAGE** \_\_3\_\_

15

July 18, 2001

To whom it may concern:

    I am writing this to give an overview of our sons' lives since their father has been incarcerated. Paul-Michael Gallo is 16 years of age; he will be 17 in October of this year. Mark Gallo is 15 years and will be 16 in March 2002.

    Mark is hurting. Father's Day was a horrible day for them and for me. Mark was angry. He walked around with tears in his eyes, but never cried. More than a couple of times he wanted to lash out, and he tried with me, nothing important but over little things. Finally, as we were walking out the door, I turned to him and in a stern but caring voice, I told him, that I am sorry that he is angry and hurt over his Dad, I knew he missed him but I will not get into an argument with him. It is ok to be angry and hurt but not to take it out on someone else. His eyes watered up but he did not cry. I told him that I was feeling the same way that he felt but I was dealing with it and had to go on.
He needed to do the same. I asked him if he would go to counseling with me but he said no. In reality no counseling will help him he needs his Dad. They were close, as he was with Paul also. Mark has started crying in the middle of the night and getting up and walking the floor. When I ask him what is wrong he just says he can't sleep. This is not like him. His grades have dropped and he is getting where he doesn't care about school. I have sent some copies of e-mails from the teachers along with this letter. Mark is Attention Deficit Disorder. A specialist in this field diagnosed him at the age of 8. He was on medication up until 3 years ago when we discussed this with his Dr. and Mark wanted to go off of it. He has been dealing with it and knows when he is not focusing. Mark is not ADHD. Lately he has been experiencing ADHD behaviors and this is because he is having just too much to handle for a young teen. He is trying so hard, and I am very proud of him. For the first time however, even with the help of IEP's and a Special Teacher he works with, he has failed two classes. He is in Summer School now but can't get the help he needs during the Summer Sessions. I am hoping that he will get the credit he needs to go on to the 10th grade. As of today, he failed Geography in Summer School. I could not get the modifications he needed and if I would have held a meeting, it was said to me that John's situation would be brought up and that would be the blame instead of the necessary modifications that needed to be in place. The teacher said that Mark did turn his assignments in but failed all tests.

Paul-Michael is having serious behavior problems. He has no male guidance and has taken out all of his anger and frustrations on me. This has become serious. He was expelled from Palm Desert High School and sent to a continuation school. He has failed those classes. He just stopped going to classes even though he is on campus. He went to Summer School and got kicked out the first day for leaving Campus. He got a job and then quit. He has

**EXHIBIT** "B"

**PAGE** 1            ATTACHMENT / EXHIBIT B

no self-esteem and is angry at the world. He is searching out male guidance from the wrong people mainly older teens or males in early 20's that are into things I don't want Paulie to get into. He will not take any direction of any kind. He has exhibited hostile behavior towards me and uses language that I do not think is appropriate. This is scary to me. He will not abide by any rules.

I must explain that this young man was President of the Student Council for his school. A leader in activities and a model student as well as a great kid who played sports and was concerned about other people and animals. He made great grades and was popular. Younger students looked up to him and he was great with kids that others made fun of. He was well liked by other boys and especially the girls. He had many friends and always had kids over or on the phone constantly. He would take friends to dances and to parties that didn't have dates or their other boyfriends couldn't go. Girls would wait in line to dance with him. Now, none of this is going on. He is just hurting and I am frightened that this will get worse. He refuses to go to counseling, as it seems he is getting advice from the wrong people. He needs his Dad and they need to be together as they have in the past.

I am enclosing some school papers from the schools on both the boys. They do not know that I have typed this letter and sent reports. I have tried to have a normal home but it is not normal anymore. As I felt it was important for John to be there when they were young, I think it is more important now as I see great kids, who everyone that met them complemented us on their behavior and manners now tell me how sorry they are. Most people do not know about John, I tell them he is out of town or that we are separated. People can be very cruel and it has been thrown up into all our faces that John was arrested. I don't care about me; I am an adult of 52 years of age but not to our sons. That is not fair.

I have no ideal why I am writing this letter, but I think that it needs to be said about our children before it is too late. These boys and myself are innocent and while I understand that my husband must pay for whatever he did I think we have all paid the price. I want to save these two boys. They are good kids. Please, for their sake consider what can be done.

Thank you for your time.

*Janet L. Gallo*

Janet L. Gallo

**EXHIBIT** "B"

**PAGE** 2

# *Digital Concepts International Inc.*

November 8, 2001

James D. Henderson , Esq.
Wilshire Bundy Plaza
12121 Wilshire Blvd.
Suite 1120
Los Angeles, Ca. 90025-1123

Dear Mr. Henderson,

Pursuant to your request I have read the "Presentence Investigation Report" of John Gallo dated 10/25/01 as to the correctness of my testimony as presented.

I would like you to be aware of the discrepancies I have found and correct them by this writing.

**Reference: PSI**
**Page: 20**
**Item 92**

**Line 2 & 3**: "Digital Concepts International, Inc. , a publicly traded company ( traded on the electronic pink sheets under the symbol "DCII)."

**Correction/Clarification:** DCII is a shell corporation that was purchased with preliminary approval to be listed on the NASDEC stock exchange, but has not currently submitted all the required documentation to be actively listed for trading. Upon the finalization of the documentation as required in the S.B. 10 form (approx. date of submission 4/1/002) it will be presented for review and hopeful acceptance. (This process should take approximately 90 days from submission, which would also allow for any corrections necessary.)

**Line 5 & 6:** "The defendant is one of three partners. However he is not named as an officer of this corporation".

**Correction/Clarification:** Mr. Gallo was a partner, the CFO & a director of DCII from the inception/purchase (see attached 2000 uniform business report filed 5/22/00) until he was deleted (see attached 2001 uniform business report filed 4/27/01). This deletion was done for presentation purposes only. Mr. Gallo was and will always be an important asset and an integral member of DCII.

ATTACHMENT / EXHIBIT  C   "C"
EXHIBIT
PAGE  1

Phone - (760) 533-8723   Fax - (760) 751-1940
14445 Cool Valley Road, Valley Center, Ca. 92082

**Reference: PSI**
**Page: 21**
**Item 94**

**Line 4 & 5:** "company assumed the first mortgage of 450,000 and the defendant took back a second mortgage of $ 250,000.00".

**Correction/Clarification:** There was a first mortgage at the time of sale, but was immediately refinanced for $ 290,000.00 & $ 287,000.00 respectively (see attached loan docs) for additional working capital of approximately $ 176,000.00 which was deposited to DCII business account (see attached bank statement from Canyon National Bank Account # 110024656).
   **Note: Mr. Gallo was an officer of the company at the time of this loan and as such signed a person guarantee for this loan in addition to Mr. Bender and Mr. Michaelson.**
]

**Reference: PSI**
**Page: 21**
**Item 94**

**Lines 12 –13:** "According to Mr. Bender, in return for his investment, the defendant received five percent of the outstanding share. These shares are worth approximately $ 2,000,000.00".

**Correction/Clarification:** I would first like to correct Mr. Gallo's ownership percentage. Mr. Gallo currently owns 1,500,000 shares of DCII. There are 50,000,000 authorized common stock shares (see attached certificate). Currently there are 24,500,000 shares outstanding. Mr. Gallo owns three (3 %) of the authorized shares or six (6.12 %) of the current outstanding. These shares are restricted shares and have a waiting period before they could be sold are transferred if there were a market in which they could be sold.

**Reference: PSI**
**Page: 21**
**Item 94**

**Lines 13 –14:** These shares are worth approximately $ 2,000,000.00".

**Correction/Clarification:** The shares of Mr. Gallo have no value because they cannot be sold. Currently DCII is not an active trading company. If the company were trading, it only has equity of approximately $ 4,000,000.00. Patents, covenants not to compete and the stage as a business mostly represent this equity. If everything could be liquidated for

EXHIBIT  "C"

financial statement amounts the shares would only be worth $ .16 each or $ 240,000.00 for Mr. Gallo's stock. Unfortunately at the present time the stock is virtually worthless.

Lastly I would like to state that even though Mr. Gallo has loans due him as reflected on the books of DCII, without Mr. Gallo's expertise and participation in the preparation of the finalization of the S.B. 10 and the operations the company and its foreign subsidiaries, the will not be in a financial stable position to repay the loans of Mr. Gallo in the event they were called upon to do so. Even upon the liquidation of its assets it would not be in a position to repay its loans (secured) and then reimburse its investors next, them look to settle with Mr. Gallo. While things look good on paper in reality without Mr. Gallo's participation in the near future the company has a poor outlook.

Should you have any questions as to the above please feel free to contact me at your earliest convenience.

Thanking you in advance for your time and consideration in this matter.

*[signature]*

Daniel Bender
President, DCII

EXHIBIT "C"

PAGE 3

Phone - (760) 533-8723   Fax - (760) 751-1940
14445 Cool Valley Road, Valley Center, Ca. 92082